**Nos. 23-3582 & 23-3613**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**CELESTIA CHAPMAN**,

Plaintiff/Appellant/Cross-Appellee,

v.

**BRENTLINGER ENTERPRISES**,

Defendant/Appellee/Cross-Appellant.

---

On Appeal from the United States District Court
for the Southern District of Ohio, Eastern Division, Case No. 2:20-cv-05009

---

**RESPONSE BRIEF OF
THE PLAINTIFF/APPELLANT/CROSS-APPELLEE**

---

Jason E. Starling (Ohio Bar No. 0082619)
WILLIS SPANGLER STARLING
4635 Trueman Boulevard, Suite 100
Hilliard, Ohio 43026
Telephone: (614) 586-7915
Facsimile: (614) 586-7901
jstarling@willisattorneys.com

*Attorneys for Plaintiff/Appellant/Cross-Appellee Celestia Chapman*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..............................................................................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES................................................................1

    A.    **Plaintiff as Appellant** ..............................................................1

    B.    **Plaintiff as Cross-Appellee** ....................................................1

STATEMENT OF THE CASE...................................................................2

SUMMARY OF THE ARGUMENT .........................................................2

ARGUMENT .........................................................................................10

    A.    **Standard of Review** ..............................................................10

    B.    **Count I: FMLA Interference** ...............................................10

        1.    **The Plain Language** ...................................................11

        2.    **The Case Law** ............................................................15

        3.    **The DOL Regulations and Opinion Letters** ........................19

        4.    **The Common Law**......................................................23

        5.    ***McDonnell Douglas* Burden Shifting Does Not Apply** ........26

    C.    **Count II: FMLA Retaliation** ...............................................31

        1.    **Alternative Indirect Evidence Argument** .............................31

        2.    **Prima Facie Case**......................................................32

3.    Pretext ..............................................................34

D.    Counts III & IV: Associational Disability Discrimination ............39

E.    Count V: Post-Employment Retaliation .........................................42

1.    Opposing Unemployment Benefits with False Statements .42

2.    Threatening Sanctions ...............................................44

F.    Count VIII: Failure to Provide COBRA Continuation Notice.....46

CONCLUSION...........................................................................................47

CERTIFICATE OF COMPLIANCE .................................................49

CERTIFICATE OF SERVICE ...........................................................49

# <u>TABLE OF AUTHORITIES</u>

## <u>Supreme Court of the United States</u>

*Burlington Northern & Santa Fe Railway Company v. White*,
548 U.S. 53, 126 S. Ct. 2405, 165 L.E.2d 345 (2006) .................................. 42, 44, 45

*Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560, 132 S.Ct. 1997, 182 L.E.2d 903 (2012) ............................................ 13

*Tex. Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248, 101 S.Ct. 1089, 67 L.E.2d 207 (1981) .............................................. 27

## <u>Sixth Circuit Cases</u>

*Arban v. West Publ'g Corp.*,
345 F.3d 390 (6th Cir. 2003) .......................................................................... 26, 27, 29

*Banks v. Bosch Rexroth Corp.*,
610 Fed.Appx. 519 (6th Cir. 2015) ........................................................................... 26

*Bartling v. Fruehauf Corp.*,
29 F.3d 1062 (6th Cir. 1994) ..................................................................................... 46

*Bobo v. United Parcel Service, Inc.*,
665 F.3d 741 (6th Cir. 2012) ..................................................................................... 36

*Casagrande v. OhioHealth Corp.*,
666 Fed.Appx. 491 (6th Cir. 2016) ..................................................................... 26, 29

*Cobb v. Contract Transp., Inc.*,
452 F.3d 543 (6th Cir. 2006) ....................................................................................... 4

*Cutcher v. Kmart Corp.*,
364 Fed.Appx. 183 (6th Cir. 2010) ........................................................................... 27

*Daugherty v. Sajar Plastics, Inc.*,
544 F.3d 696 (6th Cir. 2008) ..................................................................................... 31

*Demyanovich v. Cadon Plating & Coatings, L.L.C.*,
747 F.3d 419 (6th Cir. 2014) ...................................................................... 10

*Dyer v. Ventra Sandusky, LLC*,
934 F.3d 472 (6th Cir. 2019) ...................................................................... 22

*Ercegovich v. Goodyear Tire & Rubber Co.*,
154 F.3d 344 (6th Cir. 1998) ...................................................................... 36

*Festerman v. City of Wayne*,
611 Fed.Appx. 310 (6th Cir. 2015) ...................................................... 4, 15

*Grace v. USCAR*,
521 F.3d 655 (6th Cir. 2008) ...................................................................... 27

*Hammon v. DHL Airways, Inc.*,
165 F.3d 441 (6th Cir. 1999) ................................................................43-44

*Hardyman v. Norfolk & W. Ry. Co.*,
243 F.3d 255 (6th Cir. 2001) ...................................................................... 46

*Hoge v. Honda of Am. Mfg.*,
384 F.3d 238 (6th Cir. 2004) ...................................................................... 14

*Hunter v. Valley View Loc. Sch.*,
579 F.3d 688 (6th Cir. 2009) ................................................................ 10, 38

*Jackson v. VHS Detroit Receiving Hosp., Inc.*,
814 F.3d 769 (6th Cir. 2016) ................................................................37-38

*Martin v. Toledo Cardiology Consultants, Inc.*,
548 F.3d 405 (6th Cir. 2008) ................................................................ 36, 37

*Milman v. Fieger & Fieger, P.C.*,
58 F.4th 860 (6th Cir. 2023) ......................................................... 6, 28, 33

*Mitchell v. Chapman*,
343 F.3d 811 (6th Cir. 2003) ...................................................................... 14

*Niewiadomski v. U.S.*,
159 F.2d 683 (6th Cir. 1947) ................................................................. 24, 25

*Shazor v. Prof's Transit Mgmt.*,
744 F.3d 948 (6th Cir. 2014) ...................................................................... 31

*Singfield v. Akron Metro. Hous. Auth.*,
389 F.3d 555 (6th Cir. 2004) ...................................................................... 39

*Thomas v. U.S.*,
189 F.2d 494 (6th Cir. 1951) ...................................................... 24, 25 & n.2

*Tinker v. Sears, Roebuck, & Co.*,
127 F.3d 519 (6th Cir. 1997) ...................................................................... 38

*Tinsley v. Caterpillar Fin. Servs. Corp.*,
766 Fed.Appx. 337 (6th Cir. 2019) ............................................................ 41

*Wallace v. FedEx Corp.*,
764 F.3d 571 (6th Cir. 2014) ................................................................... 5, 29

*Wallner v. J.J.B. Hilliard, W.L. Lyons LLC*,
590 Fed.Appx. 546 (6th Cir. 2014) ....................................................... 26-27

*Zirnhelt v. Mich. Consol. Gas Co.*,
526 F.3d 282 (6th Cir. 2008) ...................................................................... 10

**<u>Other Federal Court of Appeals Cases</u>**

*Coutard v. Mun. Credit Union*,
848 F.3d 102 (2nd Cir. 2017) ............................................ 2, 11, 16, 20, 21

*Martin v. Brevard County Pub. Sch.*,
543 F.3d 1261 (11th Cir. 2008) ............................................. 2, 11, 16, 20

*Sherrod v. Philadelphia Gas Works*,
57 Fed.Appx. 68 (3rd Cir. 2003) ................................................. 16, 20, 21

*Steele v. Schafer*,
535 F.3d 689 (D.C. Cir. 2008) ................................................................... 42

*Williams v. W.D. Sports, N.M., Inc.*,
497 F.3d 1079 (10th Cir. 2007) .................................................................. 42

**<u>Sixth Circuit District Court Cases</u>**

*Cruz v. Don Pancho Mkt., LLC*,
167 F.Supp.3d 902 (W.D. Mich. 2016) ................................................44-45

*Easter v. Beacon Tri-State Staffing, Inc.*,
No. 2:17-cv-00197, 2017 U.S. Dist. LEXIS 171741 (S.D. Ohio Oct. 17, 2017).... 39

*Easter v. Beacon Tri-State Staffing, Inc.*,
No. 2:17-cv-00197,
2019 U.S. Dist. LEXIS 166348 (S.D. Ohio Sep. 27, 2019) ............................... 29, 41

*Hawthorne v. Univ. of Tenn. Health Sci. Ctr.*,
203 F.Supp.3d 886 (E.D. Tenn. 2016) .................................................. 30, 36

*Fadalla v. Life Auto. Prods.*,
No. 2:06-cv-02679, 2009 U.S. Dist. LEXIS 95395 (W.D. Tenn. Oct. 13, 2009) ... 47

*Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*,
437 F.Supp.2d 706, (S.D. Ohio 2006) ...................................................... 39

*Mitchell v. Ohio State Univ.*,
No. 2:19-cv-4162, 2023 U.S. Dist. LEXIS 180763S.D. Ohio Oct. 6, 2023) .......... 36

*Moore v. City of Clarksville*,
No. 3:10-cv-0141, 2011 U.S. Dist. LEXIS 78474 (M.D. Tenn. July 19, 2011) ..... 36

*Nasrallah v. Lakefront Lines, Inc.*,
No. 1:17-cv-60, 2017 U.S. Dist. LEXIS 80500 (N.D. Ohio May 25, 2017).......... 45

*Wethington v. Sir Goony Golf of Chattanooga*,
571 F.Supp.3d 888 (E.D. Tenn. 2021).................................................34-35

**Other District Court Cases**

*Crawford v. Creative Cost Control, Corp.*,
No. 7:21-cv-00419,
2021 U.S. Dist. LEXIS 210483 (W.D. Va. Nov. 1, 2021) ...................... 3, 16, 17, 21

*Dillon v. Maryland-Nat'l Capital Park & Planning Comm'n*,
382 F.Supp.2d 777 (D. Md. 2005) ..................................................... 11, 16, 17, 20, 21

*Girling v. JHW Servs., Inc.*,
No. 21-cv-0532, 2022 U.S. Dist. LEXIS 3315 (W.D. Tex. Jan. 7, 2022) .............. 42

*Megonnell v. Infotech Solutions, Inc.*,
No. 1:07-cv-02339,
2009 U.S. Dist. LEXIS 107677 (M.D. Penn. Nov. 18, 2009) ...................... 3, 11, 16

*Ruble v. Am. River Transp. Co.*,
799 F.Supp.2d 1017 (E.D. Mo. 2021) ......................................................... 11

*Sowards v. Toyota Motor Mfg.*,
No. 3:15-cv-13029,
2016 U.S. Dist. LEXIS 75080 (S.D. W. Va. June 9, 2016).................................... 45

**Statutes**

29 U.S.C. § 2611(12) ................................................................................ 4, 5, 13, 15

29 U.S.C. § 2611(12)(A) ...................................................................... 4, 14, 15, 16, 23

29 U.S.C. § 2611(12)(B).......................................................................... 4, 14, 16, 23

29 U.S.C. § 2614(a)(3)(B) ............................................................................ 27, 28

**Regulations**

29 C.F.R. § 825.122(d)(3) .............................................................................. 5, 19

## **Administrative Materials**

U.S. Dep't of Labor, Wage & Hour Div., FMLA Opinion Letter 2013-1, 2013 DOL FMLA LEXIS 1 (Jan. 14, 2013).................................................4, 17, 21, 22, 23

U.S. Dep't of Labor, Wage & Hour Div., FMLA Opinion Letter 2003-2, 2003 DOL FMLA LEXIS 4 (June 30, 2003)................................................................. 3, 21

## **Secondary Sources**

BALLENTINE'S LAW DICTIONARY (3rd Ed. 2010)....................................................... 13

BLACK'S LAW DICTIONARY (11th ed. 2019)............................................................ 13

MERRIAM-WEBSTER DICTIONARY (2022) ................................................................ 13

## STATEMENT OF JURISDICTION

Plaintiff/Appellant/Cross-Appellee Celestia Chapman ("Plaintiff") incorporates her Statement of Jurisdiction from her principal brief. She and Defendant/Appellee/Cross-Appellant Brentlinger Enterprises ("Defendant") agree that this Court has jurisdiction over both the appeal and the cross-appeal.

## STATEMENT OF THE ISSUES

### A.    Plaintiff as Appellant

Plaintiff incorporates her Statement of the Issues from her principal brief. Respectfully, Plaintiff contends her statement more accurately describes the specific legal and factual issues than the generic statement by Defendant.

### B.    Plaintiff as Cross-Appellee

In its principal brief, Defendant no longer disputed that it violated the Consolidated Omnibus Budget Reconciliation Act (COBRA) by failing to timely provide Plaintiff with written notice of her right to continue health insurance. Instead, Defendant only alleged that the district court abused its discretion by awarding statutory penalties of $85.00 per day the notice was late. Even then, Defendant conceded that some statutory penalties are appropriate, and it only asked this Court to reduce those penalties to $25.00 per day late. The issues on the cross-appeal are therefore limited to whether the district court properly exercised its discretion in deciding the amount of statutory penalties for the COBRA claim.

## STATEMENT OF THE CASE

Plaintiff incorporates her Statement of the Case from her principal brief. Respectfully, like the Statement of Issues, Plaintiff contends that her statement more accurately describes the facts of this case.

Additionally, however, Plaintiff adds one more set of facts relevant to Defendant's cross-appeal. Specifically, Plaintiff was prejudiced by Defendant's non-compliance with COBRA. After Defendant fired Plaintiff in July of 2019, she would have elected COBRA coverage had it been offered. (R. 68-1, Chapman Decl., ¶ 2, PAGEID #5257.) Because it was not offered, Plaintiff did not obtain new health insurance until May of 2020. (*Id.*, ¶ 3, PAGEID #5257.) During that gap in coverage, Plaintiff dangerously delayed treatment for malignant skin cancer, along with delaying other medical care. (*Id.*)

## SUMMARY OF THE ARGUMENT

First, on Plaintiff's FMLA interference claim, the FMLA does not contain the word "grandfather" anywhere in its text. Yet, in *Coutard v. Municipal Credit Union*, 848 F.3d 102 (2nd Cir. 2017), the Second Circuit found that an employee was entitled to FMLA leave to care for his grandfather. The FMLA does not contain the word "granddaughter" anywhere in its text. Yet, in *Martin v. Brevard County Public Schools*, 543 F.3d 1261 (11th Cir. 2008), the Eleventh Circuit found that an employee was entitled to FMLA leave to care for his granddaughter. The

FMLA does not contain the word "niece" anywhere in its text. Yet, in *Megonnell v. Infotech Solutions, Inc.*, No. 1:07-cv-02339, 2009 U.S. Dist. LEXIS 107677 (M.D. Penn. Nov. 18, 2009), the district court found that an employee was entitled to FMLA leave to care for her niece. Everyone understands that the FMLA only specifically lists "spouse, son, daughter, or parents" in its text. But that in no way means the "enumerated purposes" of the FMLA are limited to those family members as Defendant claimed. All those federal judges from other circuits who expanded FMLA coverage beyond "spouse, son, daughter, or parent" were not unhinged judicial activists "add[ing] language" to the statute as Defendant has accused Plaintiff of doing. Instead, they applied the plain language of the *in loco parentis* provision, under which anyone can have such a relationship with another. Even siblings. So said the U.S. Department of Labor (DOL) in FMLA Opinion Letter 2003-2, so said a federal court in *Crawford v. Creative Cost Control, Corp.*, No. 7:21-cv-00419, 2021 U.S. Dist. LEXIS 210483 (W.D. Va. Nov. 1, 2021), and even the district court in this case agreed.

The FMLA interference claim instead comes down to the only issue on which the district court ruled: whether, under the FMLA, an *in loco parentis* relationship must form when one party to the relationship is a minor. Here, the district court was the first federal court in the country to decide that issue. Given a choice between reading the FMLA expansively in favor of coverage or restrictively

and against coverage, the district court chose the latter and found a relationship with a minor was required. That was wrong. This Court recognizes that the FMLA is "a comprehensive remedial scheme designed to protect employees . . . [and] must therefore 'be construed broadly to extend coverage . . . .'" *Festerman v. City of Wayne*, 611 Fed.Appx. 310, 318 (6th Cir. 2015) (citing and quoting *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 559 (6th Cir. 2006)). Here, with that direction, the language of 29 U.S.C. § 2611(12) answers the question in Plaintiff's favor. That statute defines "son" or "daughter" in the FMLA to include "a child of a person standing in loco parentis" who is either "(A) under 18 years of age [i.e., a minor]; or (B) 18 years of age or older and incapable of self-care because of a mental or physical disability [i.e., not a minor]." Nothing in that section of the FMLA even implies that an *in loco parentis* relationship must form during minority. Nor do any of the regulations. To the contrary, the DOL, in FMLA Opinion Letter 2013-1, held that "the age of onset of a disability" required by 29 U.S.C. § 2611(12)(B)—and thus the age at which the need for an *in loco parentis* relationship arises under that provision—is "irrelevant."

Against these conclusions, Defendant, with all due respect, engaged in a great deal of sophistry. For instance, on the case law, it quoted language from this Court's decision in *Novak v. MetroHealth Medical Center*, 503 F.3d 572 (6th Cir. 2007) about how the FMLA only grants leave to "care for a parent, spouse, or

4

child" and "does not entitle an employee to leave . . . for a grandchild." But this quote is misleading, and *Novak* is not in direct conflict with the Eleventh Circuit's decision in *Martin*, because *Novak* was not addressing the FMLA's *in loco parentis* provision. Defendant also argued that the use of the word "child" in 29 U.S.C. § 2611(12) and 29 C.F.R. § 825.122(d)(3) is somehow dispositive because "child" is allegedly equivalent to "minor." Respectfully, Plaintiff's counsel is a forty-one-year-old lawyer, but he is still the "child" of his parents. That is not a self-deprecating remark on maturity, but instead recognizes that, as a biological necessity, we are all the "child" of someone. As a result, "child," when referring to a relationship with another person, such as an *in loco parentis* relationship, does not refer to age. Finally, as another example, Defendant argued that, even if Plaintiff was entitled to FMLA leave, the company allegedly fired her for "a legitimate non-discriminatory reason." But as this Court has explained, "when the absences and cause for discharge relate directly to the FMLA leave . . . there is no legitimate and independent reason for dismissal." *Wallace v. FedEx Corp.*, 764 F.3d 571, 590 (6th Cir. 2014). There are at least issues of fact on that issue here.

Second, for Plaintiff's FMLA retaliation claim, there is no question Plaintiff engaged in protected activity just a few days before Defendant fired her: she specifically asked her managers for FMLA leave that she believed applied to her situation. The FMLA has an anti-retaliation provision for a very good reason:

"[w]ithout protection, employees would be discouraged from taking authorized initial steps—including preparing or formulating a request—to access FMLA benefits." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 869 (6th Cir. 2023).  If Defendant fired Plaintiff for that request, then that is FMLA retaliation regardless of whether Plaintiff was entitled to FMLA leave.  Defendant thus misunderstood the two alternative arguments Plaintiff made on summary judgment: (a) if the real reason Defendant fired Plaintiff was for her absences to care for her sister, then that is both FMLA interference and retaliation because it was job-protected FMLA leave; or (b) in the alternative, there are issues of fact on whether Plaintiff's absences were the real reason to fire her or were instead a pretext to retaliate for merely requesting FMLA leave.  After all, Karen Betsacon, the ultimate decision-maker, was angry with Plaintiff for challenging her on whether FMLA leave applied.  There was also close temporal proximity of mere days and substantial evidence on pretext, such as a post-termination report where Plaintiff's performance was rated as "satisfactory" with "good" attendance.

As for the district court refusing to consider the alternative argument that Plaintiff's absences were a pretext to retaliate against her for merely requesting FMLA leave, Defendant could not justify the district court's action.  Instead, the best Defendant could do was label Plaintiff's alternative argument as, allegedly, perfunctory and claim the district court "was not required to scour every line in the

6

record or examine Plaintiff's claims from every possible angle in order to assist her claims." Respectfully, the district court was not required to "scour" or "assist" in anything. Here, Plaintiff provided four-and-a-half pages of analysis arguing how she had a prima facie case and issues of fact on pretext under the indirect evidence method for analyzing her FMLA retaliation claim. All the district court had to do was read those pages and either agree or disagree. Instead, it declined to even address them, improperly preventing Plaintiff from arguing that her absences were not the real reason for termination but a pretext for FMLA retaliation.

Third, Defendant also could not defend the district court ignoring Plaintiff's three pages of analysis arguing that she had a prima facie case and issues of fact on pretext for her claims of associational disability discrimination. Again, the district court could agree or disagree with Plaintiff on whether her absences were a pretext for that kind of discrimination, but it should have analyzed the argument. Instead, as with the FMLA retaliation claim, the district court only analyzed the associational disability discrimination claims as if the parties agreed that the stated reason for termination—namely, Plaintiff's absences from work—was indisputably the real reason. That was error, particularly where the facts and case law demonstrated issues of fact on a prima facie case and pretext.

Fourth, on the post-employment retaliation for the unemployment benefits, federal courts overwhelmingly hold that false statements to unemployment

agencies—in contrast to mere opposition with true statements—are materially adverse. Here, it was not "semantic nitpicking," as Defendant alleged, for Plaintiff to argue that Karen Betsacon made false statements to the Ohio Department of Job and Family Services (OFJDS); she admitted that she did. When a decision-maker plainly admits to providing "inconsistent" or "not accurate" reasons for termination to an unemployment agency, thus delaying receipt of benefits, summary judgment on the claim is not appropriate. Respectfully, the district court should not have engaged in mental gymnastics to harmonize Defendant's stated reason for termination (i.e., being absent the morning of July 17, 2019) with the reasons the company provided to ODJFS for Plaintiff's termination (i.e., "quit," "no call," "job abandonment," and terminated for "several" days of absences). At that point, there are obviously issues of fact for a jury. Last, Defendant is far afield in arguing these statements to ODJFS are allegedly inadmissible. The case was in federal court on federal question jurisdiction, so the federal law of privilege applies—not an Ohio state law privilege on unemployment proceedings.

Fifth, on the post-employment retaliation for threatening sanctions to deter an FMLA lawsuit, Defendant relies entirely on Fed. R. Civ. P. 11, calling the threat of sanctions "part of the process" under the civil rules. But, under the Supreme Court's "materially adverse" standard, anything that "might dissuade a reasonable worker" from pursuing his or her rights, even if that thing is permitted by the civil

rules, can be actionable retaliation.  Further, Defendant overlooks that, at the time of its sanctions threat, the process had not started because the case had not been filed, and so no civil rule applied.  Threatening sanctions before litigation even starts is designed for one purpose and one purpose only: to deter the protected activity of pursuing one's rights with an employment discrimination or retaliation lawsuit.  Defendant's take on this dispute would severely undermine a core purpose of the FMLA's anti-retaliation provision: to ensure no employee is intimidated into abandoning his or her rights.

Finally, on the COBRA statutory penalties, Defendant no longer challenges that it violated the statute.  Instead, Defendant alleges the district court abused its discretion in setting statutory penalties at $85.00 per day late on the notification letter instead of at $25.00 per day late.  That is an exceedingly difficult argument for Defendant.  The abuse-of-discretion standard does not let an appellate court substitute its judgment for that of the district court, and the amount of the statutory penalties—as opposed to whether it is legally proper to award any at all—is squarely a judgment call for the district court.  Here, the district court had sufficient evidence to award those penalties.  It properly found that Plaintiff was prejudiced by delaying her own cancer diagnosis, cancer treatment, and other medical treatment after being without health insurance for almost a year.  While Defendant complains this evidence was in a declaration attached to the reply brief

in support of Plaintiff's motion for partial summary judgment, the company never sought to strike the declaration nor sought leave to file a sur-reply. Defendant therefore cannot complain on appeal. Regardless, Plaintiff's testimony about her prejudice was not a new argument that would have justified either option; Plaintiff was directly responding to Defendant's argument in opposition.

## **ARGUMENT**

### A.    **Standard of Review**

This Court reviews summary judgment decisions *de novo*. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014); *Hunter v. Valley View Loc. Sch.*, 579 F.3d 688, 690-92 (6th Cir. 2009). Additionally, this Court reviews statutory penalties under COBRA for an abuse of discretion. *Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 289-91 (6th Cir. 2008).

### B.    **Count I: FMLA Interference**

In its principal brief, Defendant made the following arguments: (a) the "plain language" of the statute allegedly does not support Plaintiff; (b) the case law allegedly does not support Plaintiff; (c) the DOL regulations and guidance allegedly do not support Plaintiff; (d) the common law allegedly does not support Plaintiff; and (e) even if Plaintiff is correct that her absences were protected by the FMLA, Defendant allegedly had "legitimate, non-discriminatory reasons" to fire her. For the following reasons, the Court should reject these arguments.

### 1.    The Plain Language

First, on its plain language arguments, Defendant missed the mark entirely. According to Defendant, because the word "sibling" does not appear in the FMLA, leave to care for a sibling must not be an "enumerated purpose" of the statute. But the words "grandfather," "grandmother," "granddaughter," and "niece" are not in the statute and yet other federal courts have found leave to care for them is permitted under the FMLA's *in loco parentis* provision. *Coutard*, 848 F.3d at 107-113 (grandfather could be an *in loco parentis* "parent" of the plaintiff); *Martin*, 543 F.3d at 1265-66 (granddaughter could be an *in loco parentis* "child"); *Ruble v. Am. River Transp. Co.*, 799 F.Supp.2d 1017, 1023-25 (E.D. Mo. 2021) (grandmother could be an *in loco parentis* "parent"); *Megonnell*, 2009 U.S. Dist. LEXIS 107677, at *23-28 (niece could be an *in loco parentis* "child"); *Dillon v. Maryland-Nat'l Capital Park & Planning Comm'n*, 382 F.Supp.2d 777, 784-788 (D. Md. 2005) (grandmother could be an *in loco parenti* "parent"). Accordingly, as a starting point, just because the word "sibling" is not in the FMLA does not mean leave to care for siblings is prohibited. The *in loco parentis* provision is just as much a part of the FMLA's plain language as the more obvious provisions.

Second, Defendant also quoted several cases stating leave for a "grandchild" or a "sibling" are not a right under the FMLA—but none of these cases were decided under the FMLA's *in loco parentis* provision. Specifically:

- In *Novak v. MetroHealth Medical Center*, 503 F.3d 572 (6th Cir. 2007), the words "*in loco parentis*" are nowhere to be found. This is because *Novak* was not an *in loco parentis* case. Rather, the plaintiff "sought FMLA leave to care for her 18-year-old daughter, Victoria, who was suffering from a short-term struggle with postpartum depression." *Id.* at 580-81. The daughter, who was an adult, was not "incapable of self-care," and the plaintiff's argument that she was unable to care for her newborn infant (i.e., the grandchild) was not enough. *Id.*

- In *Brede v. Apple Computers, Inc.*, No. 1:19-cv-2130, 2020 U.S. Dist. LEXIS 11275 (N.D. Ohio Jan. 23, 2020), the plaintiff did allege an *in loco parentis* relationship with his adult sister's *children*, but none of them had "serious health conditions," so that is why he lost. Even then, *Brede* noted adult siblings could stand *in loco parentis*: "Brede has also not alleged that either he or his sister were *in loco parentis* with respect to each other, which, under certain circumstances, might have qualified him for FMLA leave to care for *her* (but not for her children)." *Id.* at *7 n.7 (emphasis in original).

- In *O'Hara v. GBS Corp.*, No. 5:12-cv-2317, 2013 U.S. Dist. LEXIS 49652, (N.D. Ohio Mar. 13, 2013), the court noted that "the FMLA extends the definitions of 'parent' and 'son or daughter' to include those standing *in loco parentis* and courts have extended FMLA coverage to such individuals, such as grandparents, aunts and siblings" but declined to analyze an *in loco parentis* argument because the plaintiff failed to allege it. *Id.* at *11.

- In *Smith v. Women's Healthcare Assocs., Inc.*, 813 F.Supp.2d 1224 (D. Or. 2011); *Gonzalez v. Madron Servs., Inc.*, No. 11-744, 2011 WL 13277507 (D.N.M. Dec. 12, 2011); and *Gude v. Rockford Ctr., Inc.*, 699 F.Supp.2d 671 (D. Del. 2010), the words "in loco parentis" are nowhere in the decisions because the plaintiffs did not argue it.

Cases that never analyzed the FMLA's *in loco parentis* provision do not, under any circumstances, stand for the proposition that "[m]ultiple courts have reached the same conclusion" as Defendant's argument on *in loco parentis* coverage. (Second Br., pg., 26, ECF No. 26.) Thus, respectfully, Defendant's out-of-context case quotes do not support its arguments on *in loco parentis* coverage for Plaintiff.

12

Third, Defendant argued that the word "child" in 29 U.S.C. § 2611(12), which defines "son or daughter," is dispositive on whether the *in loco parentis* relationship must arise during minority.  The term "child," however, is not defined by the FMLA.  "When a term goes undefined in a statute, we give the term its ordinary meaning" and can look at definitions in reliable dictionaries.  *Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-68, 132 S.Ct. 1997, 182 L.E.2d 903 (2012).  "Child" can be defined both as someone under the age of majority but also merely a son or daughter to a person.  BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "child" as "an unemancipated person under the age of majority" but also "a son or daughter"); *see also* MERRIAM-WEBSTER DICTIONARY (2022) (defining "child" as "a person not yet of the age of majority" but also "a son or daughter to human parents"); BALLENTINE'S LAW DICTIONARY (3rd Ed. 2010) (defining "child" as "a juvenile subject to parental control or guardianship" but also "a son or daughter of a person, whether infant or adult.").  It is for this reason that everyone, by biological necessity, is someone else's "child" even as an adult.  When "child" is used in the context of discussing a person's relationship to another, as the FMLA uses it, the word does not reference that person's age.

For the FMLA specifically, there are several reasons why the undefined term "child" used in 29 U.S.C. § 2611(12) means only "son or daughter of a person, whether infant or adult."  To start, the statute immediately separates subsections

(A) and (B) of 29 U.S.C. § 2611(12) by the age of the "son or daughter."  In 29 U.S.C. § 2611(12)(A), it applies to a "child" who is "under 18 years of age."  In 29 U.S.C. § 2611(12)(B), however, it applies to a "child" who is "18 years of age or older and incapable of self-care because of a mental or physical disability."  If Congress meant for the term "child" to include only those under the age of majority, it would make no sense to define such a child to include someone "18 years of age or older" as stated in 29 U.S.C. § 2611(12)(B).  To the contrary, that is a nonsensical contradiction.  *Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003) (interpreting the FMLA) ("Under accepted canons of statutory interpretation, we must . . . mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent . . . .").

Fourth, Defendant and the district court seemed to think that this inconsistency is remedied by interpreting "child" to effectively add the words "that arose during minority" to the phrases "in loco parentis" and "18 years of age or older and incapable of self-care because of a mental or physical disability" in 29 U.S.C. § 2611(12)(B).  But that is an incredible amount of work for one word.  It goes beyond just defining "child" to mean "a person not yet of the age of majority" and then letting the rest of the language in 29 U.S.C. § 2611(12) follow.  It instead means improperly "reading words or elements into a statute that do not appear on its face." *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244-51 (6th Cir. 2004).

Fifth, Defendant's interpretation of "child" is also flawed because it chooses between two competing meanings of the word—someone under the age of majority or merely a son or daughter—and elects the more restrictive.  That defies this Court's prior precedents that the FMLA is "a comprehensive remedial scheme designed to protect employees . . . [and] must therefore 'be construed broadly to extend coverage . . . .'"  *Festerman*, 611 Fed.Appx. at 318 (citing and quoting *Cobb*, 452 F.3d at 559).  Simply put, if the word "child" in 29 U.S.C. § 2611(12) can be interpreted broadly in favor of coverage or narrowly against coverage, the former must control since the FMLA is a remedial statute.  *Id.*

Finally, Defendant accused Plaintiff of, supposedly, "misleadingly quoting" 29 U.S.C. § 2611(12) "to eliminate all references to the word 'child.'"  (Second Br., pg. 28 & n.3, ECF No. 26.)  But respectfully, Defendant never really asserted this argument about the word "child" before the district court, and so Plaintiff had no reason to think Defendant would assert it here.  Instead, Defendant, at best, merely alluded to it before the district court without developing the argument.

## 2.    The Case Law

First, on the case law for the FMLA's *in loco parentis* provision, Defendant made the same two mistakes that the district court did.  Specifically, they drew inferences from (a) cases where the *in loco parentis* "child" was a non-disabled minor and thus fell under 29 U.S.C. § 2611(12)(A); and (b) cases where the

15

plaintiff was previously the *in loco parentis* minor "child" and thus also thus fell under 29 U.S.C. § 2611(12)(A).  For example, *Martin* fell under 29 U.S.C. § 2611(12)(A) because the plaintiff was an adult caring for his one-year-old granddaughter.  *Martin*, 543 F.3d at 1263-65.  *Coutard* also fell under 29 U.S.C. § 2611(12)(A) because the plaintiff was an adult who wanted to care for his grandfather who had previously raised him as a minor *in loco parentis* "child."  *Coutard*, 848 F.3d at 104-05.  The decisions in *Sherrod v. Philadelphia Gas Works*, 57 Fed.Appx. 68 (3rd Cir. 2003) and *Dillon v. Maryland-Nat'l Capital Park & Planning Comm'n*, 382 F.Supp.2d 777 (D. Md. 2005) were just like *Coutard* because the plaintiffs were adults who wanted to care for their grandmothers that had previously raised them as minors.  Finally, *Megonnell* also fell under 29 U.S.C. § 2611(12)(A) because the plaintiff was an adult caring for her minor niece.  *Megonnell*, 2009 U.S. Dist. LEXIS 107677 at *2-11.

Plaintiff's case is different.  She contends she is the *in loco parentis* "parent" to an *in loco parentis* "child"; namely, Sharon Edmonson, her sister dying of cancer.  And she contends that Ms. Edmonson qualifies as a "child" under 29 U.S.C. § 2611(12)(B)—not 29 U.S.C. § 2611(12)(A)—because her terminal cancer was so debilitating, she was "incapable of self-care."  And Plaintiff contends she is the *in loco parentis* "parent" because she was the primary caregiver for Ms. Edmonson doing everything that a traditional parent would do (e.g., cooking,

cleaning, bathing, changing clothes, financially supporting, etc.)  None of the cases that Defendant and the district court cited addressed that fact pattern.  Just because most of the federal court decisions on rare *in loco parentis* coverage involve (a) the plaintiff caring for a minor child or (b) the plaintiff was once cared for as a minor child, does not mean those are the only two situations covered by the FMLA's *in loco parentis* provision.  Reaching such a conclusion is no different than confusing what is sufficient with what is necessary to establish *in loco parentis* coverage.

Second, Defendant mistakenly attacked Plaintiff's reliance on *Crawford v. Creative Cost Control, Corp.*, No. 7:21-cv-00419, 2021 U.S. Dist. LEXIS 210483 (W.D. Va. Nov. 1, 2021).  To start, Defendant is wrong that Plaintiff supposedly "waived" reliance on this case because her argument on it was allegedly "perfunctory."[1]    In her principal brief, Plaintiff discussed the case for two paragraphs under its own heading of "The Case Law On *In Loco Parentis* Coverage Under the FMLA."  (First Br., pp. 31-32, ECF No. 22.)  Regardless, *Crawford* is not, as Defendant claimed, a case of rank judicial activism that expands the *in loco parentis* provision of the FMLA to unlimited coverage.  To the contrary, there are two limiting principles that *Crawford* follows, both of which are based on 29 U.S.C. § 2611(12)(B): (a) the adult must be "incapable of self-care

---

[1] Respectfully, Defendant's waiver-of-the-*Crawford*-case argument was itself, at least according to Defendant's logic, "perfunctory" because it consisted of two sentences in a footnote.  Plaintiff includes this footnote to highlight the overzealousness with which Defendant argued "waiver" in its principal brief.

because of a mental or physical disability" to qualify as an *in loco parentis* "child"; and (b) there must be an *in loco parentis* relationship where the plaintiff functions as the adult's "parent." The first limiting principle requires the adult who is the *in loco parentis* "child" to have the following: (1) a disability under the Americans with Disabilities Act (ADA); (2) be incapable of self-care due to that disability; (3) a serious health condition; and (4) require care for the serious health condition. U.S. Dep't of Labor, Wage & Hour Div., FMLA Opinion Letter 2013-1, 2013 DOL FMLA LEXIS 1, at *2-5 (Jan. 14, 2013). For instance, to be "incapable of self-care," the adult must require "active assistance or supervision" on "three or more" "activities of daily living" such as "hygiene, bathing, dressing, and eating" or "cooking, cleaning, shopping, paying bills . . . ." *Id.* at *14-16. The second limiting principle, having an *in loco parentis* relationship, looks primarily at "the *intention* of the person allegedly in loco parentis . . . ." *Dillon*, 382 F.Supp.2d at 787 (emphasis in original). But other factors include (1) the age of the child; (2) the degree to which the child is dependent on the person claiming *in loco parentis* status; (3) the amount of support, if any provided; and (4) the extent to which duties commonly associated with parenthood are exercised. *Id.*; *see also Crawford*, 2021 U.S. Dist. LEXIS 210483, at *6-8.

Given these requirements, not every dying adult has an *in loco parentis* relationship with another adult such as a sibling. It takes a special person to devote

18

the level of support and care necessary to establish an *in loco parentis* relationship. For instance, in Plaintiff's case, she used her every available dollar to pay her sister's bills, and to buy her sister food, clothes, and household items. (R. 60-1, Chapman Decl., ¶ 23(a), PAGEID #2967.) She cooked for and fed her dying sister. (*Id.*, ¶ 23(b), PAGEID #2967-68.) She wiped the feces from her sister, bathed her sister, dressed her sister in clean clothes, and changed the soiled sheets. (*Id.*) She brushed her sister's hair and teeth, cleaned her sister's apartment, and did her sister's laundry. (*Id.*) That kind of care and devotion does not manifest frequently or easily. In fact, in Ms. Edmonson's case, no one else wanted to provide it. Not her own mother. Not her own biological children. Not her estranged ex-husband. And not her other siblings. Only Plaintiff chose to do it.

### 3.    The DOL Regulations and Opinion Letters

First, Defendant mistakenly argued that the DOL regulations support its position. Not so. In the regulations, the DOL explained that "[p]ersons who are 'in loco parentis' include those with day-to-day responsibilities to care for and financially support a child, or, in the case of an employee, who had such responsibility for the employee when the employee was a child." 29 C.F.R. § 825.122(d)(3). Citing this language, Defendant argued the use of the word "child" again equates with "minor." For the same reasons discussed above for the statute itself, it does not, because everyone is the "child" of a "parent" regardless of age.

Second, Defendant also emphasized the phrase "when the employee was a child," but misunderstood why the DOL used that language. As seen in *Coutard*, *Sherrod*, and *Dillon*, it refers to a past *in loco parentis* relationship when the employee was the *in loco parentis* "child." Under the FMLA, when caring for another and not dealing with her own "serious health condition," the employee must still be able to perform her job. For that reason, if an employee is going to be an *in loco parentis* "child" and still employable, it will always be in the past since (a) minors are not legally employable in sufficient hours to be an "eligible employee" under the FMLA and (b) an adult incapable of self-care due to a mental or physical disability is will not be able to perform the essential functions of a job. That, by necessity, clarifies the options for *in loco parentis* coverage:

- **Option 1**: Under 29 U.S.C. § 2611(12)(A), the employee is the *in loco parentis* "parent" caring for an *in loco parentis* "child" who is a minor.

- **Option 2**: Under 29 U.S.C. § 2611(12)(B), the employee is the *in loco parentis* "parent" caring for an *in loco parentis* "child" who is an adult incapable of self-care due to a mental or physical disability.

- **Option 3**: Under 29 U.S.C. § 2611(12)(A), the employee was once an *in loco parentis* "child" as a minor who was cared for by an *in loco parentis* "parent."

- **Option 4**: Under 29 U.S.C. § 2611(12)(B), the employee was once an *in loco parentis* "child" as an adult incapable of self-care due to a mental or physical disability who was cared for by an *in loco parentis* "parent."

The first option was before the Eleventh Circuit in *Martin*. *See Martin*, 543 F.3d at 1263-65. It involves situations where the employee is serving as the "parent" to a minor who is not his or her biological, adopted, foster, or step child. The third

option seems was before the courts in *Coutard*, *Sherrod*, and *Dillon*.  *Coutard*, 848 F.3d at 104-05; *Sherrod*, 57 Fed.Appx. at 72-73; *Dillon*, 382 F.Supp.2d at 779-82. It involves an employee who, as a minor *in loco parentis* "child," was cared for by an *in loco parentis* "parent" other than his or her mother or father.  *Id.*  The second option is Plaintiff's case exactly and was before the court in *Crawford*.  *Crawford*, 2021 U.S. Dist. LEXIS 210483, at *2-4.  It involves an *in loco parentis* "parent" caring for an *in loco parentis* "child" who is an adult incapable of self-care due to a mental or physical disability.  *Id.*

Third, the DOL's own opinion letters confirm that the agency does not agree with Defendant.  In her principal brief, Plaintiff already discussed FMLA Opinion Letter 2003-2, in which the DOL found an *in loco parentis* relationship between two sisters, one of whom was a disabled adult incapable of self-care.  (First Br., pp. 26-29, ECF No. 22.)  Notably, Defendant declined to even address FMLA Opinion Letter 2003-2 in its principal brief, even to disagree with it or attempt to distinguish it.  Defendant thus failed to explain how its interpretations of the DOL regulations can be squared with a DOL opinion letter that specifically disagrees with Defendant on whether siblings can stand *in loco parentis*.

Fourth, on FMLA Opinion Letter 2013-1, Plaintiff did not "waive" her arguments on it as Defendant asserted in its principal brief.  The first time Defendant argued to the district court that an *in loco parentis* relationship must

form during minority was in the company's response in opposition to Plaintiff's motion for partial summary judgment. (R. 61, Def.'s Resp. in Opp. to Pl.'s Mot. for Partial Summary J., pp. 14-15 & n.3, PAGEID #3283-84.) On reply, Plaintiff did not rely on FMLA Opinion Letter 2013-1 in a "perfunctory" fashion. Rather, it was the centerpiece of her counterargument. To start, she specifically addressed the opinion letter in a half-page paragraph in her introduction section. (R. 68, Pl.'s Reply in Support of Pl.'s Mot. for Partial Summary J., p. 2, PAGEID #5237-38.) After that, Plaintiff discussed FMLA Opinion Letter 2013-1 again later in her reply brief, stating its key holding on this issue and then arguing that, because the letter "analyze[d] the legislative history of the FMLA, [and] [did] not just 'parrot[]' the statute as Defendant argued," it is entitled to "persuasive effect." (*Id.*, p. 7, PAGEID #5242) (citing *Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 477 (6th Cir. 2019).) Respectfully, two separate paragraph-length discussions are hardly a "one-liner" for which the district court must go "hunting," as Defendant mistakenly characterized it. In any event, it is all part of the same argument: how to interpret the *in loco parentis* provision of the FMLA.

Finally, FMLA Opinion Letter 2013-1 directly contradicts Defendant and the district court's conclusions. It held that "the age of onset of a disability is irrelevant in determining whether an individual is a 'son or daughter' under the FMLA." U.S. Dep't of Labor, Wage & Hour Div., FMLA Opinion Letter 2013-1,

2013 DOL FMLA LEXIS 1, at *5-9 (Jan. 14, 2013)). Defendant, however, claimed that this "changes nothing" on whether an *in loco parentis* relationship must form as a minor. Plaintiff disagrees. Those who are a "son or daughter" under 29 U.S.C. § 2611(12)(B) only qualify as such because of a disability that renders them incapable of self-care. If it does not matter whether that disability arises during minority or as an adult, but age does matter for an *in loco parentis* relationship, then those who are a "son or daughter" under 29 U.S.C. § 2611(12)(B) because of a disability that arose during adulthood are disfavored by the FMLA in comparison to all others who are a "son or daughter" under 29 U.S.C. § 2611(12)(A) because they are minors. Specifically, according to Defendant, the latter, as minors, can have a biological, adopted, foster, step, or *in loco parentis* "parent," but the former, because their disability arose during adulthood, can only have a biological, adopted, foster, or step parent—not an *in loco parentis* "parent." In other words, Defendant reads Congress as intentionally discriminating against individuals disabled as adults by reducing the range of permissible caregivers who could, on a job-protected basis under the FMLA, provide care to them. There is no plain language, legislative history, or case law that supports such discrimination.

### 4. The Common Law

First, Plaintiff once again did not "waive" her arguments on the common law interpretation of "*in loco parentis*," as Defendant argued in its principal brief. As

with her other arguments on whether the relationship must form during minority, Plaintiff spent a half-page paragraph discussing the "test developed for an *in loco parentis* relationship" that "imported the common law," which only uses the "age of the child" as one non-dispositive factor. (R. 68, Pl.'s Reply in Support of Pl.'s Mot. for Partial Summary J., pp. 7-8, PAGEID #5242-43.) This argument directly responded to Defendant arguing, in opposition to Plaintiff's dispositive motion, that an *in loco parentis* relationship must allegedly form during minority. (R. 61, Def.'s Resp. in Opp. to Pl.'s Mot. for Partial Summary J., pp. 14-15 & n.3, PAGEID #3283-84.) Again, it is all part of the same argument: how to interpret the *in loco parentis* provision of the FMLA.

Second, and respectfully, Plaintiff's discussion of the common law was not "self-serving and consciously selective" as Defendant alleged. (Second Br., p. 37, ECF No. 26.) Plaintiff discussed *Niewiadomski v. United States*, 159 F.2d 683 (6th Cir. 1947) because it is the case cited by federal courts and the DOL when interpreting "in loco parentis," which is undefined by the FMLA. (First Br., pp. 29-31, ECF No. 22.) *Niewiadomski*, despite being an older case, is helpful because it likewise involved federal courts interpreting the phrase "in loco parentis" that was undefined by another federal statute. *Niewiadomski*, 159 F.2d at 685. Plaintiff then cited *Thomas v. United States*, 189 F.2d 494 (6th Cir. 1951) because it further interpreted *Niewiadomski* and the undefined term "in loco parentis" in the same

federal statute, finding that "the court, in the *Niewiadomski* case, did not hold that one could not be in loco parentis to an adult." *Id.* at 498-99. Critically important, *Thomas* also held that there was no "generally accepted common law meaning" of "in loco parentis" and, instead, under "the natural and ordinary meaning" of the phrase, an *in loco parentis* relationship can form between adults. *Id.* at 498-05.[2] Simply put, *Thomas* is a reported case of this Court holding that if the term "in loco parentis" is undefined in a federal statute, then its plain and ordinary meaning includes relationships that form during adulthood. *Id.*

Third, *Niewiadomski* does not "reject[] Plaintiff's claim that a common law *in loco parentis* relationship can exist between siblings" as Defendant asserted. To make that argument, Defendant pulled an out-of-context quote stating that an *in loco parentis* relationship is different from that of brother and sister. Yes, of course it is because it is a relationship akin to a parent-child. When Plaintiff acted as the primary caregiver for her sister, Ms. Edmonson, she was no longer acting as her sister but as her parent. Typically, a person does not wipe feces from a sister, bathe her, dress her, change her clothes, change her sheets, cook for her, feed her, clean her apartment, do her laundry, and financially support her all at once. But

---

[2] *Thomas* also held that the statute in question, being remedial, "is to be liberally construed." *Thomas*, 189 F.2d at 505. The FMLA is likewise entitled to a liberal construction. *Festerman*, 611 Fed.Appx. at 318 (holding the FMLA is "a comprehensive remedial scheme . . . [and] must therefore 'be construed broadly to extend coverage.'") (citing and quoting *Cobb*, 452 F.3d at 559).

Plaintiff did all of that for her sister.  When Sharon Edmonson was dying from cancer that made her too weak to even move, it was, as their brother said, "more like a parent taking care of a baby than a child.  A child can at least help itself some.  She [i.e., Sharon] got to the point that there was no thing that she could do for herself."  (R. 56-2, J. Chapman Dep., 55:11-55:18, PAGEID #2508.)

## 5. *McDonnell Douglas* Burden Shifting Does Not Apply

For its final argument on Plaintiff's FMLA interference claim, Defendant alleged that even if Plaintiff's absences were protected, it could lawfully fire her because, supposedly, it terminated her for a "legitimate non-discriminatory reason."  For the following reasons, Defendant is wrong.

First, for an FMLA interference claim, this Court has repeatedly held that the employer's intent is irrelevant.  *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-03 (6th Cir. 2003) (noting that FMLA interference occurs if the employee is denied a substantive right and suffers harm "regardless of the intent of the employer"); *Casagrande v. OhioHealth Corp.,* 666 Fed.Appx. 491, 496 (6th Cir. 2016) ("[T]he employer's intent is irrelevant to an FMLA interference claim.") (citing *Arban*, 345 F.3d at 401); *Banks v. Bosch Rexroth Corp.*, 610 Fed.Appx. 519, 533 (6th Cir. 2015) (noting "the employer's frame of mind is not at issue" on FMLA interference claims); *Wallner v. J.J.B. Hilliard, W.L. Lyons LLC*, 590 Fed.Appx. 546, 550 (6th Cir. 2014) ("[T]he intent of the employer is irrelevant to

whether an FMLA violation has occurred under the interference theory.") (citing *Arban*, 345 F.3d at 401). Because the employer's intent is irrelevant, it makes no sense to apply the *McDonnell Douglas* framework—and its notion of whether "legitimate non-discriminatory reasons" are a pretext—to an FMLA interference claim since the purpose of that framework is to ascertain the employer's motivations for an adverse employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.E.2d 207 (1981).

Second, under this Court's precedents, there are instances when an FMLA interference claim does apply the *McDonnell Douglas* framework, but it depends upon how the employer defends the case. For the FMLA, the main right protected from interference is job-protected leave. *Arban*, 345 F.3d at 400-01; 29 U.S.C. § 2614(a)(1). However, this right is limited by 29 U.S.C. § 2614(a)(3)(B), which lets an employer fire an employee who took FMLA leave if the termination is for an "independent" reason. *Id.*; *Cutcher v. Kmart Corp.*, 364 Fed.Appx. 183, 189 (6th Cir. 2010); *Arban*, 345 F.3d at 400-01; 29 U.S.C. § 2614(a)(3)(B). If the employer defends the plaintiff's firing with this argument, then the analysis reverts to the *McDonnell Douglas* framework. *Grace v. USCAR*, 521 F.3d 655, 670-71 (6th Cir. 2008) (adopting the *McDonnell Douglas* framework for FMLA interference claims where the employer relies on 29 U.S.C. § 2614(a)(3)(B)). In this situation, the FMLA interference claim becomes no different than an FMLA retaliation claim

27

which focuses on the employer's motives.  *Milman*, 58 F.4th at 867 (explaining "the distinction between FMLA interference and retaliation claims is of no practical consequence" where the employer relies on § 2614(a)(3)(B)).

Third, in this case, Defendant is not relying upon an "independent" reason within the meaning of 29 U.S.C. § 2614(a)(3)(B), and so the *McDonnell Douglas* framework does not apply.  Before the district court, and on appeal, Defendant argued that it fired Plaintiff for "fail[ure] to give advance notice."  That is wrong and, if anything, is a new and shifting justification.  Both Karen Betsacon and Shane Self testified that the "sole reason" was "not showing up to work on July 17th, 2019" when she was caring for her dying sister.  (R. 49, Betsacon Dep., 113:19-114:7, PAGEID #583-84); (R. 56-3, Self Dep., 28:5-29:9, PAGEID #2518) ("Q: Why did you decide to terminate Celestia Chapman's employment? A: She did not show up for a revised work schedule.").  Additionally, Defendant told ODJFS that it fired Plaintiff for "several days" of absences due to her sister's cancer.  (R. 49 & 49-14, Betsacon Dep., 137:24-140:17 & Dep. Ex. 14, PAGEID #607-10, 760) ("A: Celestia was terminated because she didn't come back on the day that she was supposed to.  She had been gone for several weeks . . . .").  Simply put, Defendant claimed that it fired Plaintiff for absences from work—not for a "fail[ure] to communicate."  And those were not just any absences, but Plaintiff's absences to care for her sister protected by the FMLA.

Given these reasons provided by the decision-makers, Defendant does not defend Plaintiff's termination by claiming a reason "independent" of the FMLA leave. As the Sixth Circuit explained in *Wallace v. FedEx Corp.*, 764 F.3d 571 (6th Cir. 2014), when an employer claims it terminated an employee for absences that were FMLA qualifying, the employer is not claiming an "independent, legitimate reason" under 29 U.S.C. § 2614(a)(3)(B). *Id.* at 590 ("[W]hen the absences and cause for discharge relate directly to the FMLA leave . . . there is no legitimate and independent reason for dismissal."); *see also Casagrande*, 666 Fed.Appx. at 498 (citing *Wallace* and declining to apply the *McDonnell Douglas* framework to an FMLA interference claim); *Easter v. Beacon Tri-State Staffing, Inc.*, No. 2:17-cv-00197, 2019 U.S. Dist. LEXIS 166348, at *11-18 (S.D. Ohio Sep. 27, 2019) (same) ("If those absences should have been certified for FMLA-protected leave, and the jury finds that Plaintiff was fired for those absences, then Defendants' alleged interference would be the proximate cause of Plaintiff's termination."). Accordingly, Plaintiff's FMLA interference claim focuses on "whether the employer provided its employee the entitlements set forth in the FMLA . . . regardless of the intent of the employer." *Arban*, 345 F.3d at 401.

Fourth, even if "failure to communicate" was part of the reason, Defendant has already claimed in sworn testimony that Plaintiff's absences—which should have been job protected—were also part of the reason. The FMLA only requires

that the job-protected leave be a "negative factor" in the decision, so Defendant trying to recharacterize the decision as related to "communication," rather than the leave itself, will not save the company from liability. *Hunter*, 579 F.3d at 690-92 (adopting the "negative factor" causation standard rather than the but-for, sole-reason causation standard for FMLA retaliation claims).

Fifth, even if the *McDonnell Douglas* framework applied, there would be issues of fact on pretext. While Defendant claimed Plaintiff was for fired "fail[ure] to communicate" her absence the morning of July 17, 2019, which was her first day back to work on the alternative schedule, Plaintiff testified that she had previously told Karen Betsacon on July 11, 2019 that she would be late on that first day. (R. 60-1, Chapman Decl., ¶ 31, PAGEID #2970-71) ("On July 11, 2019, the Thursday before, I had spoken with Karen Betsacon and explained that I would be late on the first day back and would not start right at the usual start time of 9:00a.m."). Ms. Betsacon replied, "that was fine." (*Id.*) Thus, Defendant's stated reason about a lack of communication is not true and had no basis in fact. Furthermore, the honest belief doctrine would not save Defendant because it does not apply where the "decisionmaker relied on her own personal observations in making the decision rather than receiving information secondhand." *Hawthorne v. Univ. of Tenn. Health Sci. Ctr.*, 203 F.Supp.3d 886, 892 n.4 (E.D. Tenn. 2016). Here, the decision-maker, Karen Betsacon, relied on her own communications (or

alleged lack thereof) with Plaintiff about the absence on July 17, 2019. The sole issue is whether she or Plaintiff is lying; not whether Ms. Betsacon "honestly" relied on secondhand information. That credibility dispute is not decided on summary judgment. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008) (FMLA case reversing summary judgment for the employer by finding that the plaintiff's version of events must be credited); *Shazor v. Prof's Transit Mgmt.*, 744 F.3d 948, 959-60 (6th Cir. 2014) (reversing summary judgment by accepting as true the plaintiff's version of events in a he-said/she-said dispute).

Finally, while Defendant disparaged Plaintiff's testimony as "self-serving," all testimony by a party—whether plaintiff or defendant—is self-serving. Under the summary judgment standard, Plaintiff's testimony still has the same value as any defense witness's testimony. *Id.* And while Defendant also accused Plaintiff of "shifting explanations" for being absent the morning of July 17, 2019, that (while not true) is only a credibility argument for a jury.

## C.    <u>Count II</u>: FMLA Retaliation

### 1.    Alternative Indirect Evidence Argument

First, Defendant started by arguing that Plaintiff supposedly waived her alternative argument that her absence the morning of July 17, 2019 was used as a pretext for FMLA retaliation. To make this claim, Defendant mistakenly alleged that the district court had to "scour every line in the record" to find Plaintiff's

31

alternative indirect-evidence argument for FMLA retaliation. Respectfully, that was hardly the case. Plaintiff provided four-and-a-half pages of an indirect evidence analysis arguing how she had a prima facie case and issues of fact on whether her absence on July 17, 2019 was a pretext for FMLA retaliation. (R. 60, Pl.'s Resp. in Opp. to Def.'s Mot. for Summary J., pp. 24-28, PAGEID #2948-52.) The district court did not have to "scour" for anything, or "assist" Plaintiff in her claims. To the contrary, it had the indirect evidence argument right in front of it on several pages. Finally, Plaintiff did not allegedly fail to "fully develop" the argument, as Defendant claimed. Again, it was four-and-a-half pages. (*Id.*)

Second, Defendant agreed that the district court accepted the company's stated reasons for firing Plaintiff (i.e., being absent on July 17, 2019) as undisputed when, in fact, Plaintiff disputed them on an alternative indirect-evidence argument. Rather than defend the district court's decision to foreclose the alternative argument, Defendant instead argued it was a form of harmless error because, allegedly, Plaintiff could not establish issues of fact on a prima facie case of FMLA retaliation or pretext. To the contrary, as argued below, Plaintiff had issues of fact on both stages of the indirect evidence analysis.

### 2.    Prima Facie Case

For the prima facie case, Defendant's sole argument before this Court was that Plaintiff supposedly did not engage in protected activity because her absences

were not protected by the FMLA.  Respectfully, that argument failed to recognize a critical distinction: there is a difference between (a) whether Plaintiff's specific requests for "FMLA leave" were protected activity and (b) whether her absences from work were protected activity.  Plaintiff agrees that, for the latter, if the absences are not protected by the FMLA, then the absences are not protected activity under the FMLA.  But on the former, her requests, which specifically asked for "FMLA leave," are protected activity regardless of whether her absences ultimately qualified.  *Milman*, 58 F.4th at 871 ("That request, moreover, need not lead to entitlement in order to be protected.").  And the question on an indirect evidence analysis for Plaintiff's FMLA retaliation claim was whether her absence was used as a pretext to fire her for making those FMLA leave requests.

Defendant, in contrast, reads this Court's decision in *Milman* as holding that, once a plaintiff takes leave, if that leave is not covered by the FMLA, then there is no protected activity at all—even for the prior requests for FMLA leave.  (Second Br., pp. 46-47, ECF No. 26.)  Plaintiff does not agree with that interpretation of *Milman*.  Specifically, while Defendant cited the concurrence to support its interpretation, the concurrence specifically stated, "[the plaintiff] must show that her employer punished her for her request per se, not for any 'leave' that she might have taken." *Milman*, 58 F.4th at 877.  That is precisely what Plaintiff was trying to do with her indirect evidence analysis before the district court.  In fact—and this

is critically important—even Defendant argued that it did not fire Plaintiff for her leave but for her alleged "[f]ailure to comply with [her] employer's absence notice procedures" by not "observ[ing] call-in procedures." (Second Br., pp. 41-43, ECF No. 26.) While, most likely, that shifting rationale was offered to avoid clear liability should this Court find Plaintiff's leave was FMLA-protected, it nonetheless creates issues of fact. In fact, Plaintiff counters by testifying that she did provide advance notice to Ms. Betsacon several days earlier on July 11, 2019. (R. 60-1, Chapman Decl., ¶ 31, PAGEID #2970-71). In any event, Defendant's argument would be like holding that an employer can, under Title VII, lawfully fire an employee for filing a charge of discrimination unless the charge's allegation of discrimination is true. That is not how retaliation claims are supposed to work.

### 3.    Pretext

First, for pretext, Defendant in its principal brief offered no response on its own inconsistent post-termination actions. Karen Betsacon, the ultimate decision-maker on the termination, completed a "termination report" that marked Plaintiff's performance as "satisfactory" with "good" attendance. (R. 49 & 49-12, Betsacon Dep., 124:2-127:8 & Dep. Ex. 12, PAGEID #594-97, 751.) That is inconsistent with firing Plaintiff for alleged attendance issues. *Wethington v. Sir Goony Golf of Chattanooga*, 571 F.Supp.3d 888, 900-901 (E.D. Tenn. 2021) (FMLA and associational disability discrimination case finding pretext where the plaintiff was

fired for being "absent frequently" but the defendant made positive post-termination remarks) ("Those actions suggest that [the employer] did not view [the plaintiff's] performance as unsatisfactory or his absences as unacceptable.").

Second, Plaintiff's testimony about the July 11, 2019 discussion with Karen Betsacon directly rebuts the accusation that she failed to communicate or provide advance notice of absences. Specifically, on July 11, 2019, Plaintiff told Ms. Betsacon that she "would be late on the first day back [of the alternative work schedule on July 17, 2019] and would not start right at the usual start time." (R. 60-1, Chapman Decl., ¶ 31, PAGEID #2970-71.) Critically important, Plaintiff then testified that, "Ms. Betsacon told me that was fine if I was not on time the first day." (*Id.*) If Ms. Betsacon approved, then it was absolutely a pretext to fire Plaintiff for not being at work at her regular start time on July 17, 2019. As a result, Defendant and the district court are completely wrong that "the tardiness still demonstrated her inability to adhere to [MAG's] expected scheduling." (R. 72, Op. & Order, PAGEID #5694.) Ms. Betsacon's approval means she did not "expect" Plaintiff to be on time the first day. Furthermore, Plaintiff contends that she informed Ms. Betsacon and her managers "of the situation both in verbal conversations and text messages," and continually gave advance notice of her absences. (R. 60-1, Chapman Decl., ¶¶ 20-22, 24, PAGEID #2966-67, 2969); (R. 60-5 & 60-6, Pl.'s Texts Giving Advance Notice & Maintaining Communication,

PAGEID #3193, 3195-3204.)  Finally, there is no "honest belief" defense to this pretext argument.  Again, it does not apply where the "decisionmaker [i.e., Ms. Betsacon] relied on her own personal observations in making the decision rather than receiving information secondhand." *Hawthorne*, 203 F.Supp.3d at 892 n.4.

Third, Defendant also mistakenly argued that Plaintiff's comparators are allegedly not "similarly situated."  But, for this argument, Defendant's "framing of the similarly situated standard is too narrow and necessitates an exact correlation not required by the law of this circuit." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).  Instead, a plaintiff need only show that "[s]he and h[er] proposed comparators were similar in all relevant aspects." *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 751 (6th Cir. 2012); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (explaining prior Sixth Circuit case law and holding a plaintiff is not required to "demonstrate an exact correlation" instead, the comparator "must be similar in 'all of the *relevant* aspects.'") (emphasis in original).  As courts have recognized, "[e]xact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury." *Mitchell v. Ohio State Univ.*, No. 2:19-cv-4162, 2023 U.S. Dist. LEXIS 180763, at *17 (S.D. Ohio Oct. 6, 2023) (quoting *Moore v. City of Clarksville*, No. 3:10-cv-0141, 2011 U.S. Dist. LEXIS 78474, at *6-7 (M.D. Tenn. July 19, 2011)).  And it is precisely for

this reason that this Court has said an "overly narrow and restrictive definition of similarly situated [would] ma[ke] it virtually impossible for plaintiff" to show any differential treatment. *Martin*, 548 F.3d at 412.

Here, the differentiating circumstances that Defendant alleged are either wrong or irrelevant under *Ercegovich*. Specifically:

- Defendant suggested that "[u]nlike the other finance managers, Plaintiff did not just 'show up late'; Plaintiff did not show up at all" on July 17, 2019. Respectfully, Shane Self, the supervisor of the finance managers, agreed that "all the finance managers have had attendance issues now and then, being late or missing a day" and he cannot recall firing any of them except Plaintiff. (R. 56-3, Self Dep., 110:19-111:13, PAGEID #2539.) Moreover, Plaintiff was on the way to work at the time she was fired and would have just been late as she had warned Ms. Betsacon six days earlier on July 11, 2019. (R. 60-1, Chapman Decl., ¶ 31, PAGEID #2970-71.)

- Defendant suggested that Plaintiff's situation was different because, unlike the other finance managers, she allegedly "failed to give advance notices of her absences." That fact is disputed, however. Again, Plaintiff says she gave Ms. Betsacon advance notice of the late start on July 17, 2019. (*Id.*, ¶ 31, PAGEID #2970-71.) Furthermore, Plaintiff contends that she informed Ms. Betsacon and her managers "of the situation both in verbal conversations and text messages," and continually gave advance notice of her absences. (*Id.*, ¶¶ 20-22, PAGEID #2966-67); (R. 60-5 & 60-6, Pl.'s Texts Giving Advance Notice & Maintaining Communication, PAGEID #3193, 3195-3204.)

- Defendant suggested that none of the other finance managers "received a weeks-long period of discretionary leave," but the company did not explain how this is a relevant distinction. The leave, although not FMLA, was approved. So, it was not as if Plaintiff had unapproved absences of greater than one day versus another finance manager who was absent only a day.

Ultimately, all that is required are acts of "comparable seriousness," not the exact same act. *See, e.g., Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769,

776-78 (6th Cir. 2016) (plaintiff created issue of fact using comparators with alleged misconduct of "comparable seriousness") ("A plaintiff 'is not required to show that his proposed comparator's actions were identical to his own.'").  As Shane Self, one of Plaintiff's supervisors put it, all finance managers had "attendance issues," but he could "not recall" any finance manager fired for them except Plaintiff.  (R. 56-3, Self Dep., 110:19-111:13, PAGEID #2539.)

Fourth, on the shifting decision-makers, Defendant relied on only a single district court case.  (Second Br., p. 51, ECF No. 26) (citing *Kumar v. Aldrich Chem. Co.*, 911 F. Supp. 2d 571, 591 (S.D. Ohio 2012).)  Respectfully, Plaintiff contends that this Court should follow its own prior reported decision, which held that shifting decision-makers is evidence of pretext, rather than a non-binding district court case.  *Tinker v. Sears, Roebuck, & Co.*, 127 F.3d 519, 522-24 (6th Cir. 1997) ("The inconsistency of these statements . . . creates two important questions of material fact: who was actually responsible for the decision to fire [the plaintiff], and what was the reason . . . ?").

Fifth, on the inconsistent reasons that Defendant provided to ODJFS, Plaintiff did not engage in a "manipulative presentation of the evidence" as Defendant claimed.  To the contrary, Plaintiff just quoted Karen Betsacon's deposition testimony and the ODJFS submission that Defendant itself prepared. (First Br., pp. 17-19, ECF No. 22.)  In Ms. Betsacon's own words, "[s]he did not

quit," she did not engage in "job abandonment," and she was not fired for "several days" of absences as Defendant explicitly told ODJFS.  (*Id.*)  Defendant's attempt to reconcile those inconsistencies is an argument for a jury—not on summary judgment.  Additionally, this evidence is not inadmissible under an Ohio privilege as Defendant argued.   The case was in federal court on federal question jurisdiction, which applies federal law on privileges.  *Easter v. Beacon Tri-State Staffing, Inc.*, No. 2:17-cv-00197, 2017 U.S. Dist. LEXIS 171741, at *4-9 (S.D. Ohio Oct. 17, 2017) (finding Ohio's unemployment privilege did not apply in an FMLA action) ("[T]he Court concludes that no privilege for unemployment records should be recognized here."); *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F.Supp.2d 706, 719-20, 727 (S.D. Ohio 2006) (inconsistent statements made by an employer in ODJFS records were admissible to show pretext).

In summary, there were substantial issues of fact on pretext that the district court declined to even analyze.  Given the standard is "very little evidence" of pretext is needed to warrant a trial, this Court should reverse.  *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (collecting cases from across the circuits that agree on a minimal pretext standard).

## D.   <u>Counts III & IV</u>: Associational Disability Discrimination

First, as with the FMLA retaliation claim, Defendant agreed that the district court simply accepted the company's stated reasons for firing Plaintiff (i.e., being

absent on July 17, 2019) as undisputed when, in fact, Plaintiff disputed whether they were a pretext for associational disability discrimination under an alternative indirect evidence argument. And, once again, Defendant is wrong that Plaintiff did not "specify[] what that alternative argument is" for the district court. To the contrary, Plaintiff gave the district court three pages of analysis arguing that she had a prima facie case and issues of fact on pretext for her claims of associational disability discrimination. (R. 60, Pl.'s Resp. in Opp. to Def.'s Mot. for Summary J., pp. 29-31, PAGEID #2953-55.) Accordingly, that analysis was not, as Defendant accused, a "one-liner" from the introduction section.

Second, Defendant argued that Plaintiff supposedly cannot show a prima facie case of associational disability discrimination because, on August 17, 2018, it approved Plaintiff's "request for vacation to attend her sister's chemotherapy appointment," and thus the company knew of Ms. Edmondson's cancer well in advance of the adverse employment action on July 17, 2019. (Second Br., p. 60, ECF No. 26.) Defendant did not include a citation to any supporting evidence, but before the district court, it submitted only a document signed by Plaintiff and her former manager, Chico Robinson. (R. 69-9, Vacation Approval Form, PAGEID #5466.) Mr. Robinson, however, was not involved in Plaintiff's termination. Instead, the decision-makers were Karen Betsacon, Shane Self, and (maybe) Rich Montgomery. (R. 49, Betsacon Dep., 97:10-98:1, PAGEID #567-68); (R. 56-3,

40

Self Dep., 27:21-28:4, PAGEID #2518.)  There is no evidence that Mr. Robinson told the decision-makers about the cancer, and instead both Ms. Betsacon and Mr. Self testified that they only knew about the cancer roughly a month before Plaintiff's termination.   (R. 49, Betsacon Dep., 45:3-46:4, PAGEID #515-16) (testifying that she did not recall when she learned about the sister's cancer, that it was not "well before" Plaintiff's termination, and at best she knew as of June 2019); (R. 56-3, Self Dep. 58:22-62:11, PAGEID #2526-27) (same.)  One month is close enough temporal proximity to infer causation.  *Tinsley v. Caterpillar Fin. Servs. Corp.*, 766 Fed.Appx. 337, 344 (6th Cir. 2019) (collecting reported Sixth Circuit cases and finding "close" temporal proximity "include[es] time periods of just over two months, two-to-three months, and three months").

Finally, Defendant argued in a footnote—which was perhaps perfunctory by the company's logic—that this Court has allegedly ruled out associational discrimination claims under Ohio state law.  The opinion in *Easter v. Beacon Tri-State Staffing, Inc.*, No. 2:17-cv-00197, 2019 U.S. Dist. LEXIS 166348 (S.D. Ohio Sep. 27, 2019) rebuts that argument.  *Id.* at *22-26 (holding that, while the Sixth Circuit has held in dicta in unreported cases that Ohio Revised Code Chapter 4112 does not extend to associational discrimination claims, the Ohio Supreme Court and state appellate courts have so extended it) ("*Smith*, an unpublished Sixth Circuit opinion . . . did not address, or attempt to distinguish, Ohio state court cases

41

that have expressly recognized associational discrimination claims."). Faced with the choice between following the Ohio Supreme Court's interpretation of its own state law, and dicta from an unpublished opinion, the former controls. *Id.*

## E.    <u>Count V</u>: Post-Employment Retaliation

### 1.    Opposing Unemployment Benefits with False Statements

First, on the law, Plaintiff agrees that truthful opposition to an application for unemployment benefits is not materially adverse. But, under *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L.E.2d 345 (2006), an employer supplying false information to an unemployment agency is materially adverse. *See, e.g.*, *Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008) (supplying false information to an unemployment agency was actionable retaliation) ("[I]n *Burlington*, the Supreme Court indicated that a false report to government authorities can constitute retaliation . . . ."); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086-91 (10th Cir. 2007) (same even where no tangible loss of money); *Girling v. JHW Servs., Inc.*, No. 21-cv-0532, 2022 U.S. Dist. LEXIS 3315, at *5-9 & n.1 (W.D. Tex. Jan. 7, 2022) (same, collecting cases). In its principal brief, Defendant failed to even address these cases cited by Plaintiff, and instead just continued to insist that any opposition to unemployment benefits—whether true or false—is supposedly not materially adverse. Respectfully, that is inconsistent with *Burlington*'s holding.

Second, there is no question that the reasons Defendant provided to ODJFS for Plaintiff's termination (i.e., "quit," "no call," "job abandonment," and terminated for "several" days of absences) contradicted Defendant's stated reason for termination: being absent on July 17, 2019.  According to the district court and Defendant, "[t]hat two statements are inconsistent does not, however, mean that one (or perhaps either) of the statements is false: it means only that the statements are inconsistent."  (R. 72, Op. & Order, PAGEID #5697.)  Respectfully, Plaintiff disagrees.  If two statements are inconsistent, as in they contradict each other, either one statement or both must be false.

As for the district court and Defendant claiming, "'quit,' 'no call,' and 'job abandonment' are little more than other ways to describe what happened on July 17, 2019: Plaintiff did not show up to work as scheduled," that is not accurate factually or legally.  (*Id.*, PAGEID #5697.)  On the facts, Plaintiff testified that, on July 11, 2019, Karen Betsacon told her it "was fine" if she started later than her regular time on July 17, 2019, so Plaintiff did not fail to show up to work as scheduled.  (R. 60-1, Chapman Decl., ¶ 31, PAGEID #2970-71.)  On the law, this Court has held that an employee cannot be deemed to have "constructively resigned" unless she either "fail[s] to comply with [her] employer's written request requiring [her] to take a certain action" or "fail[s] to report to work for a substantial period of time."  *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447-49 (6th Cir.

1999) (applying these concepts to federal employment discrimination and retaliation statutes). The former never occurred here, as there was no written statement of "if you do not show up by 9:00am on July 17, 2019, you will be deemed to have resigned." At best, there were verbal conversations none of which stated Plaintiff would ever be deemed to have abandoned her job if she did not show up on time on July 17, 2019. *Id.* at 448 n.8 (holding, for constructive resignations, that verbal notice is insufficient and "the employer must provide the employee with written notice that his failure to act will be construed as an act of resignation"). The latter also did not occur here, because Plaintiff did not fail to report to work for a "substantial period of time"; it was only the morning of July 17, 2019, and she was fired by text message while driving to work.

### 2. Threatening Sanctions

First, contrary to Defendant's arguments, just because a sanctions motion is authorized by Fed. R. Civ. P. 11 does not mean it is simply "part of the process" that every employment discrimination plaintiff must tolerate. The *Burlington* standard controls here, and it makes anything actionable as retaliation if it "well might have 'dissuaded a reasonable worker . . .'" from pursuing his or her rights. *Burlington*, 548 U.S. at 67-68. This includes, for instance, any number of actions that a litigant could take under the civil rules, such as filing counterclaims under Fed. R. Civ. P. 13. *See Cruz v. Don Pancho Mkt., LLC*, 167 F.Supp.3d 902, 910-

12 (W.D. Mich. 2016) (surveying Sixth Circuit case law and other circuit case law and noting that courts, both before and after *Burlington*, permitted retaliation claims for an employer threatening or filing a counterclaim).  Just as with counterclaims, there is no question that threatening a terminated worker with having to pay attorneys' fees in response to a sanctions motion could dissuade a reasonable worker from pursuing an FMLA lawsuit.  *Id.* at 912 (finding that threatening "the Plaintiff . . . with the prospect of attorney's fees for the mere filing of a federal claim" was materially adverse).  This threat is not a non-actionable "trivial harm," "petty slight," or "minor annoyance."  *Burlington*, 548 U.S. at 68.

Second, Defendant misinterpreted Plaintiff's citations to *Nasrallah v. Lakefront Lines, Inc.*, No. 1:17-cv-60, 2017 U.S. Dist. LEXIS 80500 (N.D. Ohio May 25, 2017) and *Sowards v. Toyota Motor Mfg.*, No. 3:15-cv-13029, 2016 U.S. Dist. LEXIS 75080 (S.D. W. Va. June 9, 2016).  These cases did not hold that there must be both a threat under Fed. R. Civ. P. 11 and a threat or actual filing of groundless litigation for there to be a materially adverse employment action under *Burlington*.  For instance, in *Nasrallah*, the district court, speaking of only the sanctions threat letter, stated "[i]t is certainly plausible that a letter threatening drastic relief, including attorney's fees, was sent with the purpose of dissuading [the plaintiff] from pursuing her claims."  *Nasrallah*, 2017 U.S. Dist. LEXIS 80500, at *22.  Either a sanctions threat or counterclaim is independently enough.

Third, Fed. R. Civ. P. 11 could hardly justify Defendant's actions because it did not even apply. Here, Defendant's threat was not even made pursuant to the civil rule because, at the time Defendant made it, this case had not been filed and the civil rules did not apply. As a result, this prelitigation threat was not even "part of the process" that a plaintiff must tolerate, and its only possible purpose could have been to dissuade Plaintiff's lawsuit, which was protected activity.

## F.    Count VIII: Failure to Provide COBRA Continuation Notice

First, the amount of statutory penalties is squarely entrusted to the district court's discretion. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068-69 (6th Cir. 1994). An abuse of that discretion only occurs if this Court is "firmly convinced that a mistake has been made." *Id.* While "[t]here is no exact measure of what constitutes an abuse of discretion," an appellate court does not substitute its judgment for that of the trial court and, instead, "the inquiry is confined to whether such situation and circumstance clearly show . . . arbitrary action not justifiable . . . ." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 267 (6th Cir. 2001). Accordingly, considering Defendant no longer disputes that it violated COBRA, this standard should make it exceedingly difficult for the company to nitpick the amount of statutory penalties the district court chose to award.

Second, Defendant's only argument for reducing—but not eliminating—the statutory penalties is that, allegedly, there was no evidence of bad faith by

Defendant or prejudice to Plaintiff. The district court disagreed on the latter, finding that Plaintiff delayed treatment for her own malignant skin cancer and therefore was "significantly prejudiced" by the lack of COBRA coverage. (R. 72, Op. & Order, PAGEID #5702) (citing *Fadalla v. Life Auto. Prods.*, No. 2:06-cv-02679, 2009 U.S. Dist. LEXIS 95395, at *13-14 (W.D. Tenn. Oct. 13, 2009) (finding prejudice on a COBRA claim where "medical procedures were delayed by at least two weeks").) The district court's rationale was supported by undisputed testimony from Plaintiff. (R. 68-1, Chapman Decl., ¶¶ 2-3, PAGEID #5257.) Since the district court's rationale was supported by undisputed evidence, and it correctly applied the law, it could not possibly have abused its discretion. While Defendant claimed it was "minimal" prejudice for Plaintiff to delay treating her malignant skin cancer, the district court was free to disagree, as most people would find delaying treatment for a life-threatening cancer is highly prejudicial. As for Defendant arguing that Plaintiff's testimony on this topic was submitted on a reply brief "leaving MAG no opportunity to respond or rebut this evidence," the company failed to ask the district court for leave to file a sur-reply. It therefore waived that argument on appeal.

## CONCLUSION

For the foregoing reasons, this Court should reach the following conclusions:

47

A.     Reverse, remand, and instruct the district court to enter partial summary judgment on liability in Plaintiff's favor for Count I alleging FMLA interference;

B.     Reverse on Count II alleging FMLA retaliation by finding genuine issues of material fact for trial;

C.     Reverse on Counts III and IV alleging associational disability discrimination under the ADA and Ohio law by finding genuine issues of material fact for trial;

D.     Reverse on Count V alleging post-employment retaliation under the FMLA by finding genuine issues of material fact for trial;

E.     Affirm on Count VIII alleging failure to send the required written continuation notice under COBRA; and/or

F.     Reverse on the denial of Plaintiff's motion for partial summary judgment on Defendant's affirmative defense of failure to mitigate, with instructions for the district court to decide the cross-motions for summary judgment on this defense in the first instance.

Respectfully submitted,

By: /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)
WILLIS SPANGLER STARLING
4635 Trueman Boulevard, Suite 100
Hilliard, Ohio 43026
Telephone: (614) 586-7900

48

Facsimile: (614) 586-7901
jstarling@willisattorneys.com

*Attorneys for Plaintiff/Appellant/Cross-Appellee
Celestia Chapman*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), Plaintiff certifies the following for this Appellee's Brief:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,023 words, excluding the parts exempted from this count by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it is proportionally spaced using Times New Roman font that is 14-point or larger and case names are italicized.

## CERTIFICATE OF SERVICE

I certify that, on January 19, 2024, I caused a copy of this document and any attachments to be filed with the Clerk of Courts, which will provide notice and a copy of the filing via electronic mail on all counsel of record.

By: /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)

49

**Nos. 23-3582 & 23-3613**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### CELESTIA CHAPMAN,

Plaintiff/Appellant/Cross-Appellee,

v.

### BRENTLINGER ENTERPRISES,

Defendant/Appellee/Cross-Appellant.

On Appeal from the United States District Court
for the Southern District of Ohio, Eastern Division, Case No. 2:20-cv-05009

## PLAINTIFF/APPELLANT/CROSS-APPELLEE'S SUPPLEMENTAL
## DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

Pursuant to 6 Cir. R. 30(g), Plaintiff/Appellant/Cross-Appellee Celestia

Chapman submits the following Supplemental Designation of Relevant Lower

Court Documents:

| Date Filed | Record Entry No. | Description | Page Numbers |
|---|---|---|---|
| 02/10/2023 | R. 49<br>R. 49-12<br>R. 49-14 | Deposition of Karen Betsacon and Deposition Exhibits | PAGEID #515-16<br>#567-68<br>#583<br>#584<br>#594-97<br>#607-10<br>#751<br>#760 |
| 02/13/2023 | R. 56-2 | Deposition of John Chapman | PAGEID #2508 |
| 02/13/2023 | R. 56-3 | Deposition of Shane Self | PAGEID #2518<br>#2539<br>#2518<br>#2526-27 |
| 03/24/2023 | R. 60 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | PAGEID #2948-52<br>#2953-55 |

| Date Filed | Record Entry No. | Description | Page Numbers |
|---|---|---|---|
| 03/24/2023 | R. 60-1 | Declaration of Plaintiff Celestia Chapman | PAGEID #2966 #2967 #2968 #2969 #2970 #2971 |
| 03/24/2023 | R. 60-5 | Pl.'s Texts Giving Advance Notice & Maintaining Communication | PAGEID #3193 |
| 03/24/2023 | R. 60-6 | Pl.'s Texts Giving Advance Notice & Maintaining Communication | PAGEID #3195-3204 |
| 03/24/2023 | R. 61 | Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment | PAGEID #3283 #3284 |
| 05/01/2023 | R. 68 | Plaintiff's Reply Brief in Support of Her Motion for Partial Summary Judgment | PAGEID #5237 #5238 |

| **Date Filed** | **Record Entry No.** | **Description** | **Page Numbers** |
|---|---|---|---|
| 05/01/2023 | R. 68-1 | Declaration of Plaintiff Celestia Chapman | PAGEID #5257 |
| 05/01/2023 | R. 69-9 | Vacation Approval Form | PAGEID #5466 |
| 07/07/2023 | R. 72 | Opinion & Order | PAGEID #5694 #5697 |

Respectfully submitted,

By: /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)
WILLIS SPANGLER STARLING
4635 Trueman Boulevard, Suite 100
Hilliard, Ohio 43026
Telephone: (614) 586-7915
Facsimile: (614) 586-7901
jstarling@willisattorneys.com

*Attorneys for Plaintiff/Appellant/Cross-Appellee Celestia Chapman*